UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Philadelphia Indemnity Ins. Co. A/S/O Settlers Landing Association,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>1961 Boston Post Rd. LLC et al,<br><br>　　　　　Defendants. | Civil No. 3:19-cv-01943 (TOF)<br><br><br>May 4, 2021 |

### ORDER ON MOTION TO COMPEL

This is a discovery dispute in an insurance subrogation case. The defendant, Anchor Insulation Co., Inc. ("Anchor"), has moved the Court for an order compelling the plaintiff, Philadelphia Indemnity Insurance Company ("PIIC"), to produce full and unredacted copies of two adjustment reports from its independent adjuster, Edward D. Phinney of RW Adjustment Services. (ECF No. 63.)[1] PIIC objects to producing the unredacted versions of these reports, claiming that the redactions are protected by the work product doctrine and attorney-client privilege. (ECF No. 64.) Neither party requested oral argument on the motion. (*See* ECF Nos. 63, 64.) Upon its initial review of the parties' submissions, the Court ordered PIIC to submit the

---

[1]     RW Adjustment Services wrote two reports—the first dated February 10, 2019 ("February Report") and the second dated March 21, 2019 ("March Report"). (ECF No. 64-1, Exs. A & B.) PIIC produced both reports, albeit redacted, to the defendants as part of its initial disclosures. (ECF No. 64, at 1.) Anchor's motion does not specifically reference the February Report, requesting a "complete, unredacted copy of the RW Adjustment Services report dated March 21, 2019." (ECF No. 63, at 1-2.) However, Anchor also stated that "upon information and belief, this March 21, 2019 report is a second report/second draft" and requested the Court to compel the production of an unredacted copy of the prior report, "[t]o the extent a prior report exists . . . ." (*Id*. at 2.) In its opposition brief, PIIC clarified that the February Report *is* the "prior report" that Anchor referenced. (ECF No. 64, at 2.) PIIC then proceeded to interpret Anchor's motion as requesting unredacted copies of both the February and March Reports. (*See id.* at 2, 7.) The Court will do the same.

unredacted adjustment reports for an *in camera* review. (ECF No. 67.) Having now reviewed the parties' submissions and the documents produced *in camera*, the Court concludes that PIIC has not met its burden to show that the adjustment reports at issue are protected by the work product doctrine or by the attorney-client privilege. Therefore, Anchor's Motion to Compel is **GRANTED.**

I.   **BACKGROUND**

This case concerns a water loss which occurred in an apartment complex located at 1961 Boston Post Road in Westbrook, CT (the "subject property"). PIIC provided property insurance to the owners of the subject property, Settlers Landing Association. (Pl.'s Amend. Compl., ECF No. 45, ¶¶ 1-2.) PIIC alleges that on January 23, 2019, a water-supply line for the apartment complex's fire suppression sprinkler system froze and burst, causing substantial water damage. (*Id.* at ¶¶ 13-17.) PIIC claims that the line burst due to the "improper design, installation, and/or insulation of the sprinkler system . . . ." (*Id.* at ¶ 16.) PIIC brought suit, in its capacity as subrogee, against 1961 Boston Post Rd., LLC; Salt Island Properties, LLC, "the general contractors overseeing the construction of the apartment complex" (*id.* at ¶ 11); Central Connecticut Fire Protection, Inc., a subcontractor who was hired to design and install the sprinkler system (*id.* at ¶ 12); and Anchor, a subcontractor who was hired to install insulation for the sprinkler system. (*Id.* at ¶¶ 7, 13.)

On or around January 23, 2019, PIIC hired an independent adjuster, Edward D. Phinney from RW Adjustment Services, to conduct an inspection of the subject property and provide an adjustment report. (ECF No. 64-1, Ex. B, at 1.) His initial report was dated February 10, 2019 and sent directly to PIIC. (*Id.* (the "February Report").) The February Report noted that RW Adjustment Services had been in contact with PIIC's subrogation attorney, Jeffrey Zielinski, "with regards to the circumstances surrounding the sprinkler pipe break . . . ." (*Id.* at 4.) Attorney

Zielinski had hired a separate cause-and-origin investigator to inspect the sprinkler system, and that investigator was "reporting directly to Mr. Zielinski's office." (*Id.* at 4-5.) On March 21, 2019, Mr. Phinney submitted a second and final adjustment report to PIIC. (ECF No. 64-1, Ex. A, at 1 (the "March Report").)

PIIC produced partially redacted copies of the February and March Reports to the defendants as part of its initial disclosures. (ECF No. 64, at 1-2.) Two sections of the February Report, labeled "cause of loss" and "subrogation," were redacted. (ECF No. 64-1, Ex. B, at 2-3.) One section of the March Report, labeled "cause of loss," was redacted. (ECF No. 64-1, Ex. A, at 1.) PIIC's privilege log claimed that the redacted portions of the February and March Reports were protected from discovery because they were work product, attorney-client privileged, and mental impressions of the plaintiff's representatives. (ECF No. 64-1, Ex. C.) Anchor disagreed, and this motion ensued.

## II. DISCUSSION

Anchor seeks to compel the production of full, unredacted copies of the adjustment reports. (ECF No. 63, at 2.) It asserts that these reports are not work product or attorney-client privileged, since they were "created in the normal course of business and regardless of whether litigation would eventually result," and therefore must be disclosed in full. (*Id.* at 2, 5.) In response, PIIC contends that the reports were properly redacted, since the "cause of loss" and "subrogation" portions of the reports were created "in connection with the already-made decision to pursue subrogation." (ECF No. 64, at 6.) It states in a footnote that the Court "need not reach" the issue of attorney-client privilege, "given that the work-product doctrine protects the redacted information," but requested an *in camera* review on the privilege issue "to the extent the Court disagrees." (ECF No. 64, at 7 n. 2.) The Court first considers the arguments implicating the work product doctrine.

A.     **Work Product**

Anchor argues that PIIC has improperly designated the adjustment reports as being protected by the work product doctrine. (*See generally* ECF No. 63, at 2-3.) It contends that the reports were "not created *because of litigation* and would have been created regardless of litigation," since "[t]he entire purpose . . . was to determine the scope of damage and cost of repair." (*Id.* at 4 (emphasis in original).) It states that, even though the February Report indicated that PIIC had hired an attorney that was investigating its subrogation rights, there was "no evidence that [PIIC] planned to seek subrogation at any time prior to March 21, 2019." (*Id.* at 4.)

In response, PIIC argues that the redacted portions of the reports are protected work product because they were created after it had already decided to pursue subrogation. (ECF No. 64, at 6.) It points to the fact that it hired Attorney Zielinski as subrogation counsel before the February Report was written. (*Id.*) It asserts: "The cause-and-origin investigation here was undertaken under the auspices of (undersigned) subrogation counsel's office. . . . it is clear *on the face* of these reports that Plaintiff had decided to pursue subrogation no later than February 10, 2019—the date of Phinney's first report. In other words, by that point, undersigned counsel was intimately involved in the cause-and-origin investigation in connection with the already-made decision to pursue subrogation." (*Id.* (emphasis in original).) PIIC also contends that Anchor has failed to establish a substantial need for documents withheld on the grounds of the work product doctrine. (*Id.* at 7.)

   1.     *Applicable Law*

In federal court, the work product doctrine is governed by federal law and codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 105 (S.D.N.Y. 2007). The work product doctrine provides that generally, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial

by or for another party or its representative . . . ." Fed. R. Civ. P. 26(b)(3). Thus, the doctrine applies to any "materials obtained or prepared . . .with an eye toward litigation . . . ." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). When considering whether documents are protected work product, the main question is whether the documents "can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (emphasis in original) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practice & Procedure* § 2024, at 343 (1994)). "[D]ocuments that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" are not entitled to work product protection. *Id.* at 1202.

The party asserting work product protection "bears the heavy burden" of establishing that the documents were prepared or obtained because of the prospect of litigation. *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007). If the party claiming work product protection meets that burden, "the requesting party must show substantial need for the materials and inability to obtain the substantial equivalent by other means without undue hardship." *S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 409 (S.D.N.Y. 2009) (footnotes and quotation marks omitted) (quoting Fed. R. Civ. P. 26(b)(3)).

Determining whether documents were prepared or obtained "because of" anticipated litigation can be challenging in the insurance context, since "the very business of [insurance companies] is to evaluate claims that may ultimately ripen into litigation." *Weber v. Paduano*, No. 02 CIV. 3392 (GEL), 2003 WL 161340, at *4 (S.D.N.Y. Jan. 22, 2003) (citation and quotation marks omitted). Because insurance companies routinely investigate claims in the ordinary course of business without necessarily anticipating future litigation, "in the insurance context, it is particularly important that the party opposing production of the documents, on whom the burden

of proof as to privilege rests, demonstrate by specific and competent evidence that the documents were created in anticipation of litigation." *Id.* An insurer's routine investigation into a claim can cross the line into an investigation in anticipation of litigation when the insurer acted with a "sufficiently identifiable resolve to litigate." *Id.* at *6 (quoting *Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420, 423 (S.D.N.Y. 1981)). For the purposes of subrogation, "an insurer does not have an identifiable resolve to litigate until it has made a decision regarding subrogation." *Id.* (quotation marks omitted). The determination of whether the insurer sufficiently proved an "identifiable resolve to litigation" is "necessarily fact-specific." *Id.* at *4; *see also Evanston Ins. Co. v. Oea, Inc.*, No. 02-1505-DFL-PAN, 2006 WL 1192737, at *4 (S.D.N.Y. May 4, 2006) (stating that the question of "[w]hen an investigation conducted by counsel crosses the line from business-centered (and unprotected) to litigation-centered" is a "question of fact that must be determined on a case-by-case basis").

    2.    *Analysis*

Anchor argues that PIIC has failed to show that adjustment reports were created in "anticipation of litigation," even though the February Report indicates that PIIC had hired subrogation counsel. (ECF No. 63, at 2, 4.) In support of its argument, Anchor cites *QBE Insurance Corp. v. Interstate Fire & Safety Equipment Co.,* in which Judge Underhill held that an insurance company's claim notes were not work product because they were not made in anticipation of litigation. No. 3:07-CV-1883 (SRU), 2011 WL 692982, at *5 (D. Conn. Feb. 18, 2011). He wrote that "the work-product doctrine applies only once an insurer has decided upon pursuing a subrogation action, and not at the preliminary stage when the insurer is still investigating the possibility of subrogation," and "the evidence in the record [did] not support the suggestion that [the insurance company] had made any decision with respect to its subrogation rights" before the date of its last claim note. *Id.* at *3-4. Anchor states that "[s]imilarly, here, there

6

is no evidence that the plaintiff planned to seek subrogation at any time prior to March 21, 2019." (ECF No. 63, at 4.)

PIIC, in turn, argues that the evidence shows that it had already made a subrogation decision before February 10, 2019, making both adjustment reports work product. (*See* ECF No. 64 at 5-7.) It stresses the fact that it retained Attorney Zielinski as subrogation counsel, asserting that by February 10, 2019, "undersigned counsel was intimately involved in the cause-and-origin investigation in connection with the already-made decision to pursue subrogation." (*Id.* at 6.) It notes that in *QBE Ins. Corp*, "critically, the plaintiff's submitted evidence did not 'show any attorney involvement or, for that matter, any legal steps taken towards a subrogation suit.'" (*Id.* at 5 (quoting *QBE Ins. Corp.,* 2011 WL 692982, at *4).)

Though PIIC hired subrogation counsel before February 10, 2019, and the insurer's hiring of an attorney is a "significant factor in determining when the insurer anticipates litigation," it is "not determinative." *Mount Vernon Fire Ins. Co. v. Try 3 Bldg. Servs., Inc.*, No. 96 CIV. 5590 (MJL/HBP), 1998 WL 729735, at *7 (S.D.N.Y. Oct. 16, 1998). In *Weber*, for example, an insurer hired a law firm "to conduct an initial investigation regarding subrogation . . . ." 2003 WL 161340, at *8 (quotation marks omitted). The court noted that "insurance companies often hire attorneys as part of the normal claim investigation process, before litigation is anticipated and before a subrogation decision has been made," and concluded that the insurance company's hiring of a law firm to investigate subrogation "indicat[ed] that [the insurance company] had not yet decided to attempt to subrogate the [insured's] losses." *Id.* Phrased differently, an insurance company's hiring of counsel does not always show that the company had *decided* to pursue subrogation— especially when counsel was tasked to *investigate* whether subrogation would even be a possibility. See Travelers Prop. & Cas. Ins. Co. v. AAG Creperie, No. CV-2011-2066 (FBM/DG),

7

2013 WL 12432759, at *1, 4 (E.D.N.Y. Mar. 29, 2013) (holding that "materials created during an investigation into the *potential* for bringing an action for subrogation" were not work product, even though they were created after the insurance company had retained counsel, since "[t]he involvement of counsel [was] not sufficient to establish that the investigation was undertaken in anticipation of litigation" (emphasis in original)); *Tudor Ins. Co. v. Stay Secure Const. Corp.*, 290 F.R.D. 37, 40 (S.D.N.Y. 2013) ("Courts have recognize[d] that documents prepared in the ordinary course of an insurer's business . . . are not protected from discovery, even when they are provided to or prepared by counsel . . . . as a general rule, an insurance company's investigation undertaken to determine . . . whether a subrogation claim could be pursued, is not undertaken in anticipation of litigation." (quotation marks and citations omitted)).

The two adjustment reports suggest that, at most, PIIC *suspected* that it might have subrogation rights at the time – but neither one supports a conclusion that PIIC had *decided* to pursue subrogation on or before March 21, 2019. The redacted portions of the February Report confirm that, as of the date of that report, Attorney Zielinski was still investigating "potential" subrogation claims. The March Report does not reflect any change in those circumstances. PIIC has not provided any other evidence which could suffice to show that it had decided to pursue subrogation before March 21, 2019, such as evidence of "legal steps taken toward a subrogation suit." *QBE Ins. Corp*, 2011 WL 692982, at *4. Thus, PIIC's argument hinges entirely on its claim that counsel involvement in the cause-and-origin investigation is, on its own, sufficient evidence that it had decided to subrogate. (*See generally* ECF No. 64, at 6-7.) However, the record before the Court makes clear that, before March 21, 2019, PIIC was simply investigating the circumstances of the loss to determine whether subrogation would an option. As discussed above, this is not sufficient to show that PIIC had decided to pursue a subrogation claim.

For the foregoing reasons, the Court concludes that PIIC has failed to introduce "specific and competent evidence" that the adjustment reports from RW Adjustment Services were created in anticipation of litigation. By extension, PIIC has not met its burden to show that the reports are protected by the work product doctrine.

### B.     Attorney-Client Privilege

PIIC discusses its attorney-client privilege claim only in a footnote. (ECF No. 64, at 7 n.2.) Moreover, PIIC does not even attempt to explain why the adjustment reports are protected by that privilege, evidently believing that the applicability of the privilege should be obvious to the Court on *in camera* review. (*See id.* (arguing that the Court "need not reach the privilege issue given that the work-product doctrine protects the redacted information," but urging that "to the extent the Court disagrees, an *in camera* review becomes necessary on the privilege issue").) These two observations would, on their own, justify rejection of PIIC's privilege claims, since courts are under no obligation to consider claims that the proponent does not properly develop. *See, e.g., von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146-47 (2d Cir. 1987) (holding that "the burden of establishing all the essential elements" of a privilege claim is not met "by mere conclusory or ipse dixit assertions"); *Fed. Trade Comm'n v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) ("[A] court need not consider arguments relegated to footnotes.").[2] The Court has nonetheless given substantive consideration to the question of whether the information behind the redactions sustains PIIC's claims – and it concludes that it does not, at least on the record that is before it.

---

[2]     These observations also dispose of PIIC's claim that the two adjustment reports may properly be withheld on the ground that they contain the "mental impressions of [the] plaintiffs' [sic] representatives." (ECF No. 64-1, at Ex. C.) To the extent that PIIC intended to assert "mental impressions" as a distinct basis for withholding the documents, separate and apart from its work product claim, that argument was not briefed.

To explain why this is so, the Court begins by observing that state law governs the applicability of the attorney-client privilege in diversity cases like this one. *See* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."); *Allied Irish Banks,* 240 F.R.D. at 105 ("[S]tate law governs the question of attorney-client privilege in a diversity action . . . ."). The parties have not identified which state's attorney-client privilege laws should apply, but only two possibilities suggest themselves – Connecticut, the state in which Mr. Phinney wrote the reports (*see* ECF No. 64-1, Exs. A & B), and Pennsylvania, the home states of both PIIC and Attorney Zielinski. (*See* Pl.'s Am. Compl., ECF No. 45, ¶ 1 (stating that PIIC is a Pennsylvania corporation with a principal place of business in Pennsylvania); Aff. of J. Zielinski, ECF No. 22-1, ¶¶ 2-3 (stating that Attorney Zielinski lives and works in Pennsylvania).) As will be shown, the Connecticut and Pennsylvania privilege rules do not differ in any respect material to Anchor's motion, and the Court therefore does not need to decide which of the two sets of rules applies. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) ("In diversity jurisdiction cases . . . it is well settled that a federal court must look to the choice of law rules of the forum state."); *Cohen v. Roll-A-Cover, LLC*, 131 Conn. App. 443, 465-55 (2011) (holding that, under Connecticut's choice-of-law rules, "there is no need to perform a choice of law analysis" if there is no "outcome determinative conflict between applicable laws of the states with a potential interest in the case" (citation omitted)). Among other commonalities, both states place the burden on the proponent of the privilege to demonstrate that it applies. *See Harp v. King*, 266 Conn. 747, 770 (2003); *Custom Designs & Mfg. Co. v. Sherwin-Williams Co.,* 2012 Pa. Super. 33, 39 A.3d 372, 376 (2012).

In both Connecticut and Pennsylvania, the attorney-client privilege protects confidential communications between a client and its attorney for the purpose of obtaining or providing legal

advice. "[T]he attorney-client privilege protects both the confidential giving of professional legal advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice." *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 249 Conn. 36, 52 (1999); *accord Gillard v. AIG Ins. Co.,* 609 Pa. 65, 88-89 (2011) ("We hold that, in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice."). In this case, the redacted portions of the adjustment reports are not communications between an attorney and client; they are communications between a claim adjuster and an insurer. There was no attorney at either end of the communication, and the two reports therefore do not fit within the core of the attorney-client privilege.

The privilege can extend beyond its core to encompass communications between a client and a non-attorney consultant – including, presumably, an independent claims adjuster – but only when the communication is necessary or integral to the provision of legal advice. In Connecticut, for example, the privilege "can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client." *Olson v. Accessory Controls & Equip. Corp.,* 254 Conn. 145, 160 (2000) (quoting *Fed. Trade Comm'n v. TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir. 1980)). Similarly, in Pennsylvania the privilege can protect communications with non-lawyer consultants when they are "either indispensable to the lawyer giving legal advice or facilitated the lawyer's ability to give level advice to the client." *BouSamra v. Excela Health*, 210 A.3d 967, 985 (Pa. 2019). In this case, however, there is no indication that Mr. Phinney's reports were necessary or integral to Attorney

11

Zielinski's advice to PIIC. To the contrary, the reports indicate that Attorney Zielinski relied on other experts to provide his subrogation advice to his client.

The Court has considered whether a few of the redacted sentences stand on a different footing than the others, but it concludes that they do not. When Attorney Zielinski spoke with Mr. Phinney in advance of the February Report, he evidently disclosed his analysis of Settlers Landing's insurance coverage and the status of his subrogation investigation. Mr. Phinney then recorded these disclosures in his report to PIIC. Because these sentences do not contain Mr. Phinney's adjustment advice, but instead recount Attorney Zielinski's statements about his coverage advice and subrogation investigation, they arguably present different privilege considerations. To properly withhold them from discovery, however, PIIC would have had to demonstrate that Mr. Phinney was among the people to whom its attorney-client communications could be disclosed without waiving the privilege. *See Olson*, 254 Conn. at 157 ("[S]tatements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality," except that "the presence of certain third parties who are agents or employees of an attorney or client, and who are necessary to the consultation, will not destroy the confidential nature of the communications." (citations and ellipsis omitted)); *BouSamra*, 201 A.3d at 982-85 ("[T]he attorney-client privilege is waived when a confidential communication is shared with a third party," unless "the third-party's presence was either indispensable to the lawyer giving legal advice or facilitated the lawyer's ability to give legal advice to the client . . . . A party claiming a communication is privileged . . . must prove . . . [t]he privilege has been claimed and is not waived."); *Amica Mut. Ins. Co. v. Fasarella Pro Painting & Design, LLC*, No. FST-CV-10-6003636-S, 2011 WL 3671961, at *2-3 (Conn. Super. Ct. July 21, 2011) (holding that the subrogating insurer had "the burden of proving each essential element of its claim of attorney-

client privilege, which in this case would include proving the claim that [the independent adjuster] was acting as Amica's agent when he was communicating with Amica's counsel"). Here, PIIC did not make that demonstration.

### III.   CONCLUSION

For the reasons stated above, Anchor's Motion to Compel (ECF No. 63) is **GRANTED**. PIIC shall produce to Anchor the full, unredacted version of the RW Adjustment Services report dated February 10, 2019 (bearing Bates numbers P208-212), and the full, unredacted version of the RW Adjustment Services report dated March 21, 2019 (bearing Bates numbers P001-002) by 5:00 p.m. on Tuesday, May 11, 2021.

SO ORDERED at Hartford, Connecticut, this 4th day of May, 2021.

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge